Oral argument not to exceed 15 minutes per side. Mr. Davis was a defendant of the court. May it please the court. Good morning. Good morning, Mr. Stifler. My name is Don Davis. I represent the defendant, appellant, Kathy Simmerman. I'd ask for three minutes for rebuttal. Kathy Simmerman for many decades was an employee of a small credit union near Muskegon, Michigan. During that time, she was able to embezzle $1.9 million. I think it was referred to during sentencing as a jaw-dropping amount because it is. She did it over 17 years. And as anyone who reads the transcript would see, she did it 433 times because that number is mentioned more than a couple handfuls of times. She received a sentence of 78 months which was at the low end of the guideline range as computed by the district court of 28. The district court's determination of a guideline range of 28 was an error on three occasions. And I think that what you see as you review the sentencing, that the sentence was actually a result of the $1.9 million over 17 years and 433 times. But that isn't the standards for the three specific offense characteristics which the district court found. Sophisticated means, putting in jeopardy the soundness of the credit union, and an abuse of trust. It instead was a result of a large amount, the number of times, and an incorrect... Why wasn't it also a combination of the three things you just mentioned? It certainly was an abuse of trust, wasn't it? Well, I don't think, no, well, as we're just chatting about it, surely, because all bank trusts, all bank tellers are in a position of trust. And when they violate that trust... She was in charge of the unit, wasn't she? She was not only a teller when she started, but she also evolved into a manager. And as I said, it was a small credit union, and she operated the credit union. And obviously, when you have a small credit union like that, a small institution, the manager who really has supervisory authority over the other people in that institution occupies, based on her position and all of that, a special position of trust, does she not? Not in the context of bank embezzlement, not in the context of a bank teller. The guideline itself tells us it doesn't... So if you're looking at a bank, if the manager does it, who is it in a bank who occupies a position of trust? Is it no one? No, not at all. And this court, over the years since 2002, starting with Humphrey and ending in 2011 with Sweet, and there's a whole bunch of cases in between, has been very specific that it doesn't... No question about it. And frankly, she was not very well supervised herself. But this court, on numerous occasions, say it's not the amount of supervision either that she exercised or she didn't have. She wasn't very supervised because she had just a volunteer board that basically supervised her, which really vested in her greater discretion. And back to what Judge Merritt said, why those three factors didn't make this, these enhancements, justifiable. I want to talk a little bit about the sophisticated means which you have argued against. And you said it was basically a matter of her getting money and putting it in a purse. But she employed a number of methods to cover up this thing, her actions, that certainly is more than just going to the bank and putting money in your purse. I mean, she had these different ledger operations, creating fictitious teledraws. Why isn't that sophisticated means? Because it wasn't sophisticated, Your Honor. And that sounds like a snarky answer, and I don't mean it to. Not as a part of a plea agreement. Just the government's own observation, the defendant's own observation of the conduct that they knew occurred, they had agreed, not with each other, but just agreed that it wasn't sophisticated. It wasn't sophisticated because, as the government said at sentencing, and which I fully agree with, here's what she did each and every day. She took cash out of a file cabinet. They called it the vault, but it wasn't locked. She took cash out of the file cabinet, stuck it in her purse, and for the most part, went home. Sometimes she walked around the corner, actually the corner of the desk, and had another employee put it into either her... What you're saying to me is how she covered it up. But her cover-up, when she took it out of the cash drawer, she made an entry in a ledger, in a ledger, daily, that put the money supposedly in another cash drawer. For years and years and years, she could cover it up in the sense that none of her superiors would be clever enough to figure it out, until the credit union went broke or almost broke. Generally, that's a reflection of her superiors, because as soon as an auditor came in who wasn't satisfied with her simple answer, it's a shell game, the money isn't here, it's there, oh, thank you, Catherine, we ought to maybe move it back over here, and they'd move on. An adequate auditor came in, immediately saw that, and that's when the house of cards collapsed. These companies are sloppily run, I guess. It was sloppily run, that doesn't make her sophisticated. She put the money in her purse, she went home. This is not some fancy computer entries that are going to be lost in cyberspace someplace. She put it in her purse and took it home. Bank larceny 433 times. So no auditor picked this up for 17 years? That's correct. Same auditors. They would come in and they'd say, that's a lot of cash that you have in your corresponding banks. You really ought to think about moving it back to this bank. I will refer to bank carelessly, it's a credit union. Move it back into your bank so that you can invest it more wisely. She would nod knowingly and say, I should do that. And finally an outside auditor came in, wasn't satisfied with this shell game, and said, I need to see those records. And they weren't there. She knew they weren't there. She knew that day. Her statement, in response to the auditor, you ought to move some of the money. Oh, I can do that. Doesn't that kind of speak to her discretion? I'm sorry, I didn't. I said, doesn't that kind of speak to the discretion that she had about where to park or invest money? You just said that she really didn't have any degree of discretion. But her apparent discretion in the face of these auditors seemed to suggest that she either had discretion or presented herself as one in a sufficient position to exercise discretion on behalf of that financial institution. It wasn't discretion as this Court has used it from Humphrey to Sweet and the cases in between. This Court, speaking broadly, this Court has said over and over again that that's handling money. She had discretion to handle money. She moved it around all over the place as part of the shell game. She didn't manage money. Starting with Humphrey, that person, that person was head teller for ten, the head vault teller for ten different institutions. Far more that of employee and handling the money discretion. You know, we can't sentence everybody up here. I mean, we have to give deference to some extent to what the district court finds. And I don't see that this is out of bounds in some way. And you have told the district court continuously, and this is more back to abuse of trust, but you've told the district courts continually that it's not the amount of supervision the person had, that it's the amount of the ability that they had in discretion of managing money, not handling money. Now, I've shifted there from sophisticated, of course, to the position of skill and trust. But it's still, you have told the district court seven times that when they awarded, if that's the proper term, awarded abuse of skill or trust to a bank teller or a person like a bank teller, calling them a manager, head teller, vault teller, it didn't matter. But you don't look to the lack of supervision. You don't look that they were able to handle money and the discretion to handle money. You look at how they could manage money. And all Catherine Simmerman did was take it out of one place and put it into another and put it wherever they weren't happening to look. And it's really just putting it into this fictitious teller drawer. It was a ledger entry, but it's a teller drawer. So that they, on a daily basis, nobody looked on a daily basis. And on an annual basis, it's at a corresponding bank. But if you think we should bring it back, we should. I'd like to spend a moment or two talking about the soundness. Well, before you get to that, your client did move money between different ledges so that the drawers and the accounts would match. Yes. Now, an ordinary teller wouldn't get to do that in that credit union, would they? It's outside of the record, I believe, Your Honor. But, in fact, when she wasn't there or when somebody else had to get cash, the other tellers did exactly the same thing. Now, they didn't put it in false drawers. They didn't put it in a false teller. She always used her own teller number, but they would do essentially the same thing. When they took money out of the cash drawer, it had to be recorded someplace, and they would record it going into their own drawers. Ms. Zimmerman recorded going into this fictitious drawer. And she also created accounts for family members, fictitious accounts for them to help in her scheme, didn't she? That was not part of the scheme. That was worth $1.9 million, a lot of money. She couldn't spend it all. Actually, she didn't spend much of it herself. A lot of it went to a deadbeat son who had a drug problem and a horse problem. Money was just going left and right. She just walked out and put it in teller. That's how she was giving money away. The other accounts had nothing to do with her scheme. The two sons, her husband, her own account was just part of the way. She wants to give her credit for being a philanthropist. Yes, yes. But that's not one of the guideline attributes. And it's a lot of money. Just before my time expires, I do want to mention the soundness. Note 13. Before you go into that, what standard of review are we under here? There seems to be cases, some of which say we should use clear error and others say de novo. What is your take on the correct standard of review? If we disagreed on the facts, if we disagreed that it wasn't $1.9 million, instead it was 1.2, or if we disagreed on the number of times or if we disagreed on the years, it would be deference to the district court's finding of fact. But we agree on the facts. It's how the court applied those facts to the standards. Are you saying that the standard of review doesn't make a difference here? Is that what you're saying? No, I'm saying that because we agree on the facts, that the deference to clear, that the deferential standard of clear error doesn't apply and instead it should be de novo as to the way the court applied those facts, as the way the court applied those facts to these various special defense characteristics. On Note 13, there are four. This is back to the soundness. There are four questions that the district court should ask, and we did ask. You know, you're actually out of time, but you could take some time from your rebuttal time if you'd like. I will do that. How much time would you like to take from your three minutes? I'd ask from my, oh, you mean now? Yeah. With your red lights on. Yes, I see that. I'm going to use it. I'm not going to gamble. I'll take my three minutes on rebuttal, and I will talk about that subject as part of rebuttal. All right. Thank you, Your Honor. Good morning. May it please the court. Clay Stifler on behalf of the government. And I'd like to begin on this last point about what the standard of review is, and I would urge Your Honors to take a look at the Supreme Court case of United States v. Buford, 121S Court 1276. We are on a clear error standard. Buford involved a case in which the parties did not dispute the facts, and it was a question about whether or not certain prior criminal convictions should be related for the career offender enhancement. The Buford court held that discretion needed to be given to the sentencing judge's decision for a number of reasons, closeness to the facts, experience with sentencing, a lot of the other panoply of things that a district court judge does. I think some of the confusion, Your Honor, and you raised a very interesting point to me in trying to figure out what the standard of review is, because there are cases that say we're on de novo, and there are cases that would say that we're on clear error. My read of it is that the cases that say de novo, such as Humphrey, were pre-Buford cases. So I would suggest that Buford controls. The other interesting thing about Buford is, and this is easier for me to understand, is that the application of the facts to the law is reviewed for clear error. And that's really what happens here at a sentencing. Judge Bell didn't make a call that every single time a teller embezzles money, that person should get the enhancement. Or conversely, he didn't make a call that every single time a teller embezzles money, that she shouldn't get the enhancement. This was the application of the facts to the law. And Buford says that the application of the facts to the law is clear error. So if Odell Beckham Jr. catches a ball and he's about to go out of bounds, then the referee right there says he's in bounds, and the cameras up in the booth don't show clearly that the foot was on the line or out of bounds, then we go with what the person, the referee right there, made the call. And that's really what happened here, Your Honors. He heard a lot of testimony. There was a lot of briefing. So I'm notwithstanding the Odell Beckham reference, I want to get to the start where counsel wanted to get to and we didn't get there, so I want to make sure you get there. In this case, clearly the institution did not become, I guess, technically insolvent. There didn't have to be some kind of government bailout. I mean, they continued to go. So in the face of that, applying the law to the facts, how do we justify the propriety of that enhancement, even using a clear error standard? Well, Your Honor, I would start with four words, I guess three and a half words. Substantial jeopardy, which doesn't say actual jeopardy, actual bankruptcy, actual liquidation. And my third and a half word is non-exhaustive. As the Zeck court held and the Young court held, which are cited in my brief, this is a non-exhaustive list by definition of the things that... Did they have a fidelity bond in this case? There was, Your Honor. Otherwise they would have been bankrupt. That's correct, Your Honor. And so the reason why I'm focusing on those three and a half words, Your Honor, to answer your question, or four words, non-exhaustive, maybe that's one word. The reason why I'm focusing on those is that by virtue of the statute, the National Credit Union Act, the testimony from the National Credit Union witness was that by virtue of the statute, 1790D, when a credit union such as Shoreline is critically undercapitalized with a net worth of less than 2%, it requires action by the board. True, that's not a government bailout as we think of what happened during the last financial crisis. I would not try and suggest that somebody threw a lot of money at this credit union like they did at GM and AIG, but it is government action. And given a non-exhaustive list of examples, and the fact that it doesn't require, the enhancement doesn't require actual insolvency, the Credit Union Act obviously contemplates that if you're below this threshold, which was established at the sentencing, that the board has to do something. And in this case, they did enact. They let it continue operating for 180 days, during which time they did recover, Your Honor, on the fidelity bond, and they were able to bring their net worth back up, but substantially jeopardized. As the district judge found, there was a period of time here when they really were in jeopardy. Now, there's a couple other things I wanted to make. Some points on Mr. Davis' repeated reference to Ms. Zimmerman as a teller, with all due respect, is incorrect. One thing I learned from being involved in this case, and you'll see some references from the defendant's own allocution, that credit unions are different than banks, and they see themselves as different. They're a softer, kinder, gentler financial institution. It's a wonderful life institution. And if you use the word bank with them... From Odell Beckham to Jimmy Stewart. If you use the word bank with them, they take umbrage at that. And the reason why I make that point is that her job title was manager, but the statute, the National Credit Union Act, defines a manager as a CEO. They just don't use that language because it doesn't fit with their image. So everything flows from that. She is not a bank teller. She is the CEO of a stand-alone, one-branch credit union with, at most, a part-time board that meets once a month. And so if you picture the credit union on a daily basis, who's in charge? Who's there looking over her shoulder? There's no video cameras on the vault. There's no dual-control policy. And those are important distinctions from the Humphrey case. The Humphrey case, cited by the defendant, held that a bank teller who was subject to a video-recorded vault, they found that to be key in finding that she didn't have discretion. They didn't abuse a position of trust because there was such little trust that they recorded what she was doing in the vault. Here, there's no video camera system. There's no requirement that somebody else count the money with her. It goes on for 15 years, despite the existence of an audit. She had absolute control over the credit union. And one other important fact, I think, to show the abusive position of trust and the control and the lack of supervision is she gave cash. Now picture this. She gave cash to the tellers on a, at least weekly basis, large amounts of cash to deposit into her family's bank accounts. That would raise a red flag at any other financial institution except where she had a little fiefdom and she was in complete control. And as you see from the statements that the tellers made that they submitted that are in the record, that they believe, they absolutely believed they hadn't been trained by her, they didn't recognize this as red flags. And why is this important? Because any case that involved large amounts of cash, you always have the issue with how to launder it. And she was able to use her position of trust to launder, she used the employees there as her little puppets to launder all the money. My defendants who make a lot of cash, their biggest problem is the cash. It always is the cash. That's why Bitcoin exists. That's why all these other Hadawala banking systems exist. Because there is a problem with cash. She was able by virtue of her complete, utter, absolute fiefdom to use her employees to deposit the cash into her family's account and launder it that way. That ties into the sophisticated means. Now I took the position at sentencing, as Mr. Davis correctly points out, I took the position that sophisticated means shouldn't apply. I did take that position. But I focused on the crime and the judge, the district judge, focused on the cover-up. And I wasn't aware of Irwin and May and some of the other cases cited in my brief that by structuring this circuit's precedent, that by structuring deposits through relatives' accounts, that is sufficient for use of sophisticated means. And here she obviously pled guilty to a structuring account. She structured to keep the deposits under $10,000. And she used all these accounts to hide the money trail from any sort of scrutiny from FISERF. Another thing, Your Honor, and I'm directing this at you because I think I obviously like a certain point that you made, that you said that the sophisticated means and the abusive position of trust kind of go together. And Mr. Davis said that there weren't any fancy computer entries and there wasn't a cloud or anything like that, but that's actually not what's in the record. And if you look at the PSR, it's very dense technical data that I don't want to bore you with. But she used dormant accounts. She used investments. When the auditor showed up, she said that certain money was on deposit at their correspondent credit union. And then when they left, she would put it on deposit at the vault. Those were the investments she was making. And then when there was first these substantial questions about where that money was, she had the discretion to make investments in the form of jumbo CDs, which you'll see in the sentencing transcript. She claimed that the missing money was investments that she had made on behalf of the financial institution. So the fact that she was able to make investments to manipulate the financial system. And the other tellers weren't doing general ledger reports to be given to the auditors. The other tellers weren't manipulating dormant accounts. The other tellers weren't doing these things. So I do believe that the sophisticated cover-up, the structuring of the money, and the length of time really makes this case different from some of the other cases that Mr. Davis cites in his brief. It's different from Humphrey's. In that case, that was a bank teller who was monitored by a video system. It's different from almost all the other cases involving tellers because she's not a teller. There's no one else there to look over her shoulder and see what she's doing. Another important issue is this idea that Mr. Davis started out that the real driving factor with the district judge's decision was the amount of money. That it was a large amount and then it went along and he was simply offended by that and hammered her with a long sentence. And you'll see in the transcript that he makes a record about the actual factors cited in the sentencing guidelines. So, for example, on abuse of position of trust, Mr. Davis argued Humphrey's to the district judge. He cited it, case in verse, right to him. And the judge specifically rejected it. And he said, we're not talking about a teller. He made a factual finding that we're talking about a manager. And he didn't rely on any sort of gestalt view of trust. He specifically said that as a manager of this credit union, she was given certain discretion, which is one of the points that this circuit has made clear is important. Including, honestly, completely directing the people under them and directing them where the monies are to be taken from and where they are put to. Now that's a shorthand way of the structuring of the monies through the employees. It further held the district judge that she had the responsibility, she had been given discretion in how to manage the credit union. And that also played into her use of how to manipulate the financial systems in order to fool these auditors for so long. And obviously specifically distinguished the main case that the defendant relies on. So in sum, I would say, Your Honor, that there's no clear error here. That is the standard that we're operating under. I think the receiver's foot was inbounds and the district judge made that call. And there's no video cameras to show that that was wrong. Thank you. Thank you. Any rebuttal? Thank you, Your Honor. I would quickly like to address the standard review. Don't disagree with Buford. But the district court found, and you can't tell whether he used all those criteria, because the district court found that 433 times was sophisticated. He said, We trust tellers. She violated. He said it's in the transcript. All 433 times is not complicated. That's not extensive. It's a long period of time, 433 separate transactions. And this is sophisticated. So we can't really tell whether all these other things were included. As to soundness, I would like to address soundness. The government brought in a witness, went through Note 13. There are four factors in Note 13 of soundness. First, asked, Did the bank go insolvent? Did the credit union go insolvent? The answer, No. Did it reduce benefits? No. Did it fail to satisfy any demands? No. Was it forced to merge? No. That's just because of the fidelity bond, right? That's exactly right, Your Honor. Because, and the credit union and the credit union board both said to the public, It will not fail. Why? Because everyone knew all along there was an insurance policy that was going to pay $1.25 million, which puts it into the category of well capitalized. Now, what does that go to? What argument, when you have to go out and pay premium for a fidelity bond, which is then paid in order to keep the banking facility going, what is your point? My point is that the bank was never in jeopardy of being undercapitalized because whether it isn't forcing them to buy the insurance, but they did have the insurance. Everyone knew they had the insurance, and the credit union's board's responsibility was to either take some action. She was not in a position of trust, or that means that there was no risk, or what does it mean? It has nothing to do, my argument has nothing to do with position of trust, and it has nothing to do with sophisticated. It has to do with the four levels the court increased the sentence. Four levels, which is 50%? Yes. Insurance doesn't always pay off. It depends on the degree of negligence and willfulness in disregard of duties. The contract of our law, the insurance company is able to invoke these other things. Absolutely, Your Honor, and that's the first reaction anyone has to insurance. They might not pay off. They're always looking for a way not to pay off. In the cases that are cited by the government, for instance, Zeck, there was some question as to whether or not the insurance company would pay off. There was never any question here. She acknowledged her involvement and her guilt from the get-go. But even though she acknowledged it, that's one of the factors that the insurance company could look at, the period of time, you know, what it did, and making the determination of whether or not they would pay off based on whether there was, I guess, this excessive negligence. But, you know, you say that they were never at risk. Didn't their net worth go down to something like 1.8% and they had to get some extension of time before these issues were worked out so they could bring the capitalization back up? And doesn't that meet this criteria of substantial insolvency, if you would? You're correct. If you ignore the perspective insurance policy, I think 1.8% is exactly right, which means it's severely undercapitalized, which forces the board to liquidate or consolidate or take such other action. Such other action, and the example is bailout. What did the board do? The board knew all the facts that we have. They knew more. And what did they do? They did nothing. Government inaction isn't doing nothing. That's like I'm allowed to appear today because the government didn't stop me from appearing, and that's some government action. It's not government inaction to do nothing. What the board said is we will leave the credit union alone for another 180 days because they knew it was 1.8% of capitalization. They knew that there was $1.25 million in insurance coming in, and it's far better for everyone to keep the credit union alive instead of taking any other action, like a bailout or declared it insolvent. During that period, that six-month period, it was pretty much on life support. Wouldn't you agree? I mean, I know you say there was that insurance policy out there, but they were on life support. They do a call report every six months, and from the time they did the call report where it was 1.8% to the time they did the call report in September, the call report in September had them over 8%, which is well capitalized. Life support, I don't know how to answer that because I don't know what it means in the terms of credit union. Nothing happened. You're out of time, so thank you. Thank you. Thank you all very much. Thank you very much. Next case may be called.